FILED

JUN 16 2023

DOUGLAS T. SHIMA
CLERK OF APPELLATE COURTS

IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,968

In the Matter of CHRISTOPHER C. BARNDS,
*Respondent.*

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed June 16, 2023. Three-month suspension, stayed pending successful completion of two-year period of probation.

*Matthew J. Vogelsberg*, Chief Deputy Disciplinary Administrator, argued the cause and was on the formal complaint for the petitioner.

*Christopher C. Barnds*, respondent, argued the cause pro se.

PER CURIAM:  This is an original proceeding in discipline filed by the Office of the Disciplinary Administrator against the respondent Christopher C. Barnds, of Overland Park, an attorney admitted to practice law in Kansas in September 2012.

On August 25, 2022, the Disciplinary Administrator's office filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed an answer to the formal complaint on September 15, 2022. A panel of the Kansas Board for Discipline of Attorneys held a hearing on December 1, 2022. The respondent appeared with counsel, Diane L. Bellquist.

At the end of the hearing, the panel determined that the respondent violated KRPC 3.4(c) (2023 Kan. S. Ct. R. 394) (knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists),

1

KRPC 4.4(a) (2023 Kan. S. Ct. R. 405) (shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person), KRPC 8.4(a) (2023 Kan. S. Ct. R. 433) (to violate the rules or knowingly assist another to do so), KRPC 8.4(d) (engage in conduct that is prejudicial to the administration of justice), and KRPC 8.4(g) (engage in any other conduct that adversely reflects on the lawyer's fitness to practice law). The panel set forth its findings of fact and conclusions of law, along with its recommendation on disposition, in a final hearing report, the relevant portions of which are set forth below. The respondent initially filed exceptions to the hearing panel's report but later withdrew them.

"Findings of Fact

. . . .

"*Count 1-DA13,349*

"9.     In March 2017, respondent entered his appearance on behalf of [R.R.] in a post-divorce, child-custody dispute in Johnson County District Court Case No. 2015-CV-724.

"10.     Around the time respondent entered his appearance, [R.R.]'s ex-wife, [M.], had filed an emergency motion to suspend [R.R.]'s parenting time of the former couple's two minor children. [M.] was also seeking the court's permission to relocate with the children to the state of Washington.

"11.     On April 3, 2017, the presiding judge, Hon. Christina Dunn Gyllenborg, appointed attorney Tobi Bitner to serve as the Guardian ad Litem (GAL) to represent the bests interests of the children pursuant to K.S.A. Supreme Court Rule 110A (2022 Kan. S. Ct. R. at 193).

2

"12.    Rule 110A(c)(1) states in pertinent part:

'Conducting an Independent Investigation. A guardian *ad litem* must conduct an independent investigation and review all relevant documents and records, including those of social service agencies, police, courts, physicians, mental health practitioners, and schools. Interviews—either in person or by telephone—of the child, parents, social workers, relatives, school personnel, court-appointed special advocates (CASAs), caregivers, and others having knowledge of the facts are recommended. Continuing investigation and ongoing contact with the child are mandatory.'

"13.    In April 2017, [R.R.] was the defendant in a pending criminal case. That same month, both [R.R.] and respondent sent emails to Bitner, indicating that she could communicate directly with [R.R.]'s criminal defense attorney, Trey Pettlon, about the pending criminal case.

"14.    In December 2017, there was a change in the individual appointed by the court to monitor [R.R.]'s parenting time. On December 14, 2017, respondent sent Bitner an email regarding the changes in the monitor and manner in which supervised exchanges were taking place. In his email, respondent wrote:

'I very honestly feel like these changes are retaliatory against my client and I for having a legitimate difference in opinion as to what was ordered last week. If you want to dislike me, or punish me in some way, that's fine. I sadly understand how personal feelings can play a role in these cases, and I can accept that and work with that. But I do not think it's fair (among a lot of other concerns) that my client gets punished because his attorney is telling him he understood the court's orders to be something different then what the GAL thought.'

"15.    On December 18, respondent sent a follow-up email to his December 14 email to Bitner. In the email, respondent wrote:

3

'I am not showing any response to my email below. I would like to arrange a time to talk to you. This can occur over the phone or in person, although my availability for the latter will be more limited. I am also hoping you have seen the recent ROA notes that were recently uploaded. As one of the issue [*sic*] I want to discuss is how we plan to make up some of the time dad lost this past week.'

"16.    That same day, Bitner responded by email, stating:

'In the past few weeks, you have sent an onslaught of emails stating you continue to be confused over the Court's orders, implying I am not only that I am [*sic*] impartial, but that I have some sort of a personal vendetta against you, and making false statements about me to the professionals involved in this case.

'You emailed me on Friday, 12/8/17, and requested a time to meet with me in my office. I replied the same day with my availability (choosing from the times you suggested) and held that time open on my calendar for Monday, 12/11/17. You didn't reply and never showed up. I emailed a follow up the same day and you replied, telling me you would get back to me with additional times to speak. You never replied again. Then, you sent the email on this email chain, alleging my impartiality again, on 12/14/17.

'Now, you email me and request I set aside more time to talk.

'Given all of your allegations, your continued misunderstandings about orders, and the fact you've misrepresented my statements to professionals in this case, I believe the only communication we need to have at this juncture should be in written form or on the record.'

4

"17.     On December 20, 2017, Bitner filed a Motion for an Emergency Hearing to Modify the Temporary Parenting Plan, alleging that [R.R.] was refusing to comply with the parameters set forth by the parenting time supervisor and her to assure all parties were following the court's temporary orders. Accordingly, Bitner moved the court to find that it was in the best interest of the minor children for [R.R.] to have supervised parenting time through the Layne Project until further order of the court.

"18.     At 2:04 p.m. on December 20, Bitner sent an email to counsel for the parties with the subject line: 'Reed 15CV0724—EMERGENCY Motion Attached— request for hearing.' Attached to the email was a copy of Bitner's emergency motion.

"19.     At 2:16 p.m., respondent sent an email to Bitner with the subject line: 'REED: Sincere Ethical Concerns.' In the email, respondent wrote:

> 'As you have requested we only communicate via email, and have stated you do not wish to talk to me over the phone or in person, I have no other option but to communicate this message via email.
>
> 'I have concerns you have violated your ethical obligations in this case as a GAL. Specifically, I have been advised you have spoken to other third-parties about this case without having any formal or legal release to do so. Among those who have been reported you talked to, is attorney Trey Pettlon. Can you please immediately forward [to] me the release that has been executed authorizing you to speak with Mr. Pettlon, or any release for that matter that you presently have from my client authorizing you to speak with any third-party.'

"20.     At 2:31 p.m., Bitner replied to respondent's 'Ethical Concerns' email and carbon copied attorney Pettlon on the email. In the reply email, Bitner stated:

> 'I can assure you that I have upheld my ethical obligations, pursuant to the Court's Orders and Rule 110A. It is also my understanding

that Mr. Pettlon can make any disclosures necessary, in his client's
best interest, he believes are appropriate. However, I will let Mr. Pettlon
speak for himself.'

"21.    Respondent replied at 2:36 p.m., stating: 'Are you indicating you do not
believe you needed a release to speak directly with my client's criminal attorney?'

"22.    At 3:03 p.m., respondent replied to Bitner's emergency motion email,
stating:

'Didn't want to mention anything about the kids commenting on being
exposed to Grandparents over the last 24 hrs? I think we both see where
this is going. I will be filing a Motion to have you removed, as I think
you are incapable of providing objective and impartial representation for
the children. You have taken a personal issue with me, and apparently
with my client, and let it turn into something much greater. That is not
o.k.'

"23.    At 3:22 p.m., Bitner responded to respondent's email regarding a release to speak
to Pettlon. Bitner stated:

'I am not sure what you seek to gain from continuing to ask me the same
question. Not only is your allegation out of bounds, but it is completely
unfounded. [R.R.] requested I communicate with Mr. Pettlon and, as
counsel for [R.R.], you are aware of this and have even participated in
email exchanges with Mr. Pettlon and myself.'

"24.    At 3:28 p.m., Bitner responded to respondent's emergency motion email, telling
respondent that he was free to file whatever motion he felt was appropriate and beneficial to his
client.

6

"25.   At 5:10 p.m., respondent replied to Bitner's email regarding speaking to Pettlon, stating:

> 'I understand your position. Should I feel the need to further discuss this issue, I will reach out. I am going to try and step away from our email communications until after the Christmas holiday, as I think we would both agree they are no longer helping to resolve anything, and only deteriorating the situation further. With time being arranged through Sunday, I also do not see a need to contact until after the holiday.
>
> 'Hope you have a merry Christmas.'

"26.   On February 6, 2018, respondent, on behalf of [R.R.], filed a motion entitled, 'Time Sensitive Motion to Immediately Remove Current Guardian Ad Litem and Appoint Case Manager or New Guardian Ad Litem.' In the motion, respondent alleged that Bitner needed to be immediately removed as the GAL because of a 'fundamental conflict between Ms. Bitner's duties and responsibilities to the minor children and the court in this matter, and Ms. Bitner's actions in this case over recent months.'

"27.   In the motion, respondent alleged that Bitner had (1) made a social media post mocking respondent; (2) demonstrated prejudice towards [R.R.]; (3) called [R.R.] an 'idiot' during Judge Assisted Mediation; (4) intentionally failed to vet the possibility of the children's paternal grandfather serving as a parenting time monitor; (5) intentionally failed to investigate allegations of child alienation by [M.]; (6) attempted to force the new parenting time monitor's services upon [R.R.] sooner than what the court had ordered; (7) seeking to limit [R.R.]'s parenting time out of bias, vindictiveness, and prejudice; (8) issuing a unilateral 'order' to stop [R.R.]'s parenting time; (9) reporting to professionals (but not the court) that she believed [M.] raised allegations of abuse against [R.R.] to assist her in her quest to relocate herself and the children to Washington; and (10) reporting to the court that 'every professional' [R.R.] encountered regarding the custody case had problems with him.

7

"28.    Both Bitner and [M.]'s counsel filed responses, denying the allegations.

"29.    On February 28, 2018, Judge Gyllenborg conducted a hearing on respondent's motion. From the bench, Judge Gyllenborg denied the motion and directed respondent to prepare a proposed journal entry pursuant to Rule 170 (2022 Kan. S. Ct. R. at 236).

"30.    In March of 2018, Judge Gyllenborg recused herself and Judge Robert Wonnell was assigned to preside over the case.

"31.    Because Bitner and [M.]'s counsel objected to the proposed journal entry that respondent prepared, respondent submitted the proposed journal entry and accompanying objections to the district court to settle the journal entry pursuant to Rule 170(d)(3).

"32.    Prior to the district court settling the journal entry, respondent sent an email to Bitner on April 6, 2018, advising her that if she did not voluntarily withdraw as GAL from the case,

> 'I fully intend on filing a Motion for Reconsideration before Judge
> Wonnell as soon as the JE from our Feb. 28th hearing is actually entered.
> As you likely know, I cannot file that motion until the judge signed JE is
> actually on file. Which is the only reason such a Motion has not been
> filked [*sic*] yet. From the date the JE is formally entered, I have 28 days
> to file my Motion. A Motion I again fully intend to file if you do not
> wish to recuse yourself in line with Father's statutory rights. At which
> point I also intend to have Judge Wonnell fully review each and every
> allegation I levied against you. As the bias, prejudice, and favoritism in
> this case has gotten beyond control—and at this point it is becoming
> severely detrimental to the emotional and psychological well being of
> two very young children.'

"33.    On June 12, 2018, Judge Gyllenborg issued a journal entry regarding the orders she made at the February 28, 2018 hearing, which included denying [R.R.]'s Motion to Remove

8

Bitner as the GAL. In denying this motion, the court found that

> 'GAL Bitner has put in countless hours, that she has previously made
> recommendations to the Court that have been at times beneficial to
> Father, and at times beneficial to Mother. GAL Bitner has not
> presented to this Court as being prejudiced to either party, and she
> has not displayed animosity toward Father. GAL Bitner previously
> recommended an expansion of Father's time with the minor children
> despite objection by Mother. The Court followed that GAL
> recommendation. The Court additionally finds that GAL Bitner is still
> committed to work diligently to seek a good relationship by working
> with both the children and the parents. GAL Bitner's investigation is
> ongoing. The Court is not surprised by the ongoing disputed issues
> between the parties. The Court is amazed by the time GAL Bitner
> has put into the case, despite respondent being behind on his payment of
> GAL fees.'

"34.     Notably, the court ordered 'in the event a party intends to file a pleading that
contains information regarding attorney misconduct, such pleading shall first be emailed to
opposing counsel and a copy emailed to the Court for a threshold determination of whether the
pleading will be allowed to be filed, and whether such pleading shall be filed under seal.'

"35.     Finally, the court granted [M.]'s request for an award of attorney fees against
Father for 2.75 hours of attorney time required to respond to the Motion to Remove Guardian ad
Litem.

"36.     On July 10, 2018, respondent, on [R.R.]'s behalf, filed a Motion for New Trial or
in the Alternative, to Alter or Amend pursuant to K.S.A. 60-259 and Motion for Appointment of
Case Manager. In the motion, respondent argued that the court's June 12 journal entry amounted
to an 'erroneous ruling' and was 'contrary to the evidence that was available to be presented at a
hearing on the motion' and 'additional evidence that has came to light since.'

9

"37.    In addition to some of the previous allegations respondent raised in his February 6, 2018, motion, respondent claimed in the current motion that Bitner had failed to respond to several emails he had sent to her on March 20, 22, 28, and April 23, 2018, asking Bitner to articulate the safety concerns she had regarding father having parenting time with the children. Respondent stated that '[d]espite email, after email, after email being sent requesting this information, the GAL never responded to a single email. *And still has not responded to any such emails to this date.* These emails can be submitted to this Court as record evidence at a hearing on this Motion.' (Emphasis added.) Respondent claimed that Bitner's alleged failure to respond to these emails 'was yet another example' of her 'extreme bias and prejudice' in this matter, which respondent claimed was the result of [R.R.] failing to timely submit payments to Bitner for her GAL services, compared to [M.], who timely paid Bitner.

"38.    Subsequently, Bitner and [M.]'s counsel filed responses to respondent's motion, both noting that respondent had failed to comply with the district court's June 12, 2018, journal entry, requiring any party that intends to file a pleading containing information regarding alleged attorney misconduct to first email the pleading to opposing counsel and the court 'for a threshold determination of whether the pleading will be allowed to be filed, and whether such pleading shall be filed under seal.' Bitner again denied the allegations contained in respondent's motion. Regarding the allegation that she failed to respond to the emails mentioned above, Bitner stated: 'The GAL vehemently denies the allegations in this subparagraph and asserts she diligently responds to the parties in this case, despite [R.R.]'s continuing failure to comply with the Orders of this Court and remit payment to the GAL.'

"39.    On September 6, 2018, the district court conducted a hearing and ultimately denied the motion for new trial.

"40.    On December 17-18, 2018, the district court conducted a hearing on [M.]'s motions for sole legal custody of the children and to relocate them to Washington and [R.R.]'s motion to modify the parenting plan. Subsequently, the court issued a journal entry denying the motion to relocate the children and granting in part and denying in part the remaining motions.

"41.    On February 7, 2019, attorney Catherine Zigtema entered her appearance on

10

behalf of Bitner and filed a motion seeking judicial review of a proposed Motion for Sanctions and Attorney's Fees pursuant to the district court's June 12, 2018, journal entry. The motion asked the court to provide direction on whether the proposed motion should be publicly filed or filed under seal. Copies of the proposed Motion for Sanctions and Attorney's Fees were emailed to the court and counsel for the parties.

"42.    After receiving approval, Bitner publicly filed her Motion for Sanctions and Attorney's Fees on February 14, 2019. Within the motion, Bitner asked that [R.R.] and respondent be sanctioned for (1) repeated violations of court orders and directives in this matter; (2) repeated use of improper litigation tactics alleging unfounded ethics violations; (3) repeated use of other cumbersome, excessive, and improper litigation tactics; (4) and repeated failure to conduct litigation in a civil and appropriate manner consistent with the pillars of professionalism.

"43.    Bitner pointed out that respondent violated the court's June 12, 2018, journal entry by publicly filing his July 10, 2018 motion for a new trial (alleging that Bitner had engaged in attorney misconduct) without first submitting it to the court for review to determine whether the motion should be publicly filed or filed under seal.

"44.    In addition to respondent's allegations against Bitner in publicly filed motions, Bitner also noted that respondent had alleged in emails and phone calls to her that she had engaged in unethical conduct. Bitner stated that respondent's allegations 'appear to be an attempt to coerce the Guardian Ad Litem to take a particular action or make a particular recommendation favorable to his client' and noted the December 20, 2017, email she had received from respondent, claiming that she had improperly communicated with third parties regarding [R.R.], including [R.R.]'s criminal defense attorney.

"45.    Finally, Bitner argued that respondent's conduct towards her was substantially similar to his conduct in a Wyandotte County domestic case where respondent had also filed a motion to remove and replace the GAL. Bitner argued that the GAL in that case filed a response to the motion by filing an affidavit with the court, which documented her efforts in the case and described a phone call she had with respondent where respondent accused her of ethical violations. Notably, the GAL stated she believed respondent engaged in the conduct to

11

improperly influence her decisions.

    "46.    The district court conducted an evidentiary hearing on the motion on March 29, 2019.

    "47.    On July 18, 2019, the district court issued its journal entry regarding the March 29, 2019, hearing. The district court found that respondent had violated the court's previous June 12, 2018, journal entry by filing his July 11, 2018, motion for new trial without first seeking judicial review of whether the motion should be filed publicly or under seal. The court noted that respondent's motion

> 'contained allegations of misconduct by the GAL and its filing, without court permission, was in direct violation of the current, standing applicable order. The fact that the judge ruling on the matter had changed did not negate the prior Judge's order. The filing of this motion in direct violation of the court's directive is sanctionable conduct.'

    "48.    As a sanction, the court ordered respondent to personally pay $250 to Bitner and $250 to [M.]'s counsel.

    "49.    The court also found troubling the email respondent sent to Bitner on December 20, 2017, stating that he had 'concerns' Bitner had violated her ethical obligations as GAL in the case, accusing her of speaking to 'third-parties about this case without having any formal or legal release to do so,' and asking her to forward the executed release that authorized her to speak with third parties. The court stated:

> 'If [Respondent] had knowledge of any action, inaction, or conduct which in his opinion constituted misconduct of the GAL, he had an obligation to inform the appropriate professional authority. See Rule 226, Kan. R. Prof. Conduct 8.3. Second, he is alleging that the GAL engaged in improper communications without a release and demanded to see her authority. Again, this request does not serve a legitimate purpose as the

original order appointing the GAL clearly states that the GAL has the
court-ordered authorization to review the records of and/or interview
any agency, school, school district, organization, person or office,
including the Clerk of the Court, any police department or law
enforcement agency, any pediatrician, psychologist, psychiatrist,
hospital, mental health treatment facility, medical provider, social
worker, welfare agency, doctor, nurse, teacher, school official, staff,
etc. In the email, [Respondent] states that he has 'been advised' (although
he does not say by whom) that GAL has spoken to third-parties without
a release to do so. This is simply false. Third, [Respondent] implies
that it was improper for the GAL to have spoken with [R.R.]'s other
attorney. [R.R.]'s other attorney would have the responsibility to decide
what matters could be discussed with the GAL. Additionally,
[Respondent] himself emailed the GAL and specifically stated that
the emails had a "clear release" and [R.R.] could save some money
if the GAL would email [R.R.] directly and not have [Respondent]
relay information.'

"50.    Accordingly, the court concluded that the email 'served no legitimate purpose'
and that its timing (sent 12 minutes after the GAL notified respondent that she would be filing an
emergency motion) left the court 'with no other conclusion [but] that the email from [Respondent]
was meant to harass or intimidate the GAL and that [Respondent] acted in bad faith in sending
the email.'

"51.    The district court also took issue with the allegation respondent made in his July
10, 2018, Motion for New Trial, claiming that Bitner had failed to respond to his emails
requesting the safety concerns she had regarding [R.R.] having parenting time and that she 'still
has not responded to any such emails to this date.' The district court noted that at the March 29,
2019, hearing, [R.R.] 'affirmed [Respondent's] statement that the list of safety concerns was
actually received by [Respondent] in June 2018.' The court also noted that respondent offered no
evidence to support the allegation made in the July 10, 2018, motion 'that the GAL was
responding to emails from [M.] because she was paying her bills and ignoring [R.R.]'s emails

13

because he was late on payments to the GAL.'

"52.     The district court took judicial notice of the Wyandotte County child custody case that Bitner had noted in her motion for sanctions. The court noted that the pleadings respondent filed in the Wyandotte County case regarding the GAL were substantially similar to the pleadings he filed in the current case. The court concluded that in both cases, respondent would accuse the GAL of 'extreme bias and prejudice' whenever the GAL happened to advocate for a position contrary to that of respondent.

"53.     In taking judicial notice of the Wyandotte County case, the court stated that it was 'not taking judicial notice as to whether or not the assertions actually occurred or of the Judge's ultimate ruling, but rather only of the fact that Respondent's counsel filed a pleading making these allegations against another GAL.'

"54.     The court specifically found that respondent acted in bad faith when he engaged in the conduct noted above. As a result, the district court ordered respondent to personally pay $2,500 in attorney's fees to Zigtema. This was in addition to the $500 in attorneys' fees he was ordered to pay Mother's counsel and Bitner for filing his July 11, 2018, motion without first seeking court approval.

"55.     Subsequently, both Judge Wonnell and Zigtema filed complaints with the Office of the Disciplinary Administrator (ODA) regarding respondent's conduct. The matter was docketed for investigation as DA13,349.

"56.     On September 16, 2019, the ODA received respondent's response to the complaints, contending that he did not engage in any unethical conduct. In part, he claimed that if he would have received sufficient notice that he needed to present evidence at the March 29, 2019, hearing of Bitner's extreme prejudice against [R.R.] due to [R.R.]'s failure to timely pay Bitner's GAL fees, respondent would have presented such evidence. Furthermore, respondent claimed that the email he sent to Bitner on December 20, 2018, regarding the ethical concerns he had with Bitner was not sent in bad faith or in retaliation for Bitner filing her motion asking for an emergency hearing to modify the temporary parenting plan.

14

"57.     In the underlying custody case, respondent sought to challenge the district court's journal entry by filing a motion for new trial or alter or amend the judgment on August 15, 2019. After that motion was denied on September 11, 2019, respondent filed a notice of appeal on October 8, 2019.

"58.     In October 2019, Bitner and Zigtema retained attorney Eric Kraft to collect the attorneys' fees that Barnds was ordered to pay to them. On October 24, Kraft obtained an order of garnishment for a bank account that respondent had with Commerce Bank.

"59.     Ultimately, respondent did not appeal the district court's journal entry. Instead, he settled the judgments he owed to Zigtema and Bitner, with satisfactions of judgment being filed on November 12, and December 2, 2019, respectively.

*"Count II-DA13,563*

"60.     Based on an incident that occurred on April 1, 2020, J.S. filed a petition for protection from abuse (PFA) pursuant to K.S.A. 60-3101 *et seq.* against M.S. in Johnson County District Court on April 22, 2020 (Case No. 20-CV-1790). That same day, temporary orders were issued, which prevented M.S. from contacting J.S.

"61.     Prior to J.S. filing the PFA petition, J.S. and M.S. had dated intermittently for approximately 10 years. In May 2019, J.S. was arrested and charged in Johnson County District Court with domestic battery (Case No. 19-DV-00640). M.S. was the alleged victim. In November 2019, the State dismissed the charge without prejudice.

"62.     Shortly after filing the PFA petition, J.S. retained attorney Joseph Booth to represent her.

"63.     M.S. initially retained attorney Suzanne Hale Robinson to represent him. Robinson entered her appearance in the case on May 7, 2020, but subsequently filed a motion to withdraw five days later. On May 19, Robinson was allowed to withdraw, and respondent

formally entered his appearance on behalf of M.S.

"64.    The day before, May 18, respondent and Booth began exchanging emails regarding the PFA case. Booth informed respondent that M.S. had been calling J.S. and leaving her several voice messages in violation of the temporary orders.

"65.    That same day, respondent sent a reply email to Booth, thanking him for the information. [R]espondent also wrote:

> 'What time are you available tomorrow afternoon? I would like to
> talk timely, as [J.S.] has a lot of property and money of [M.S.], *and*
> *I need to assess if I need to file separate actions for those issues and*
> *the allegations being levied. He is also noting concerns of tax fraud*
> *on [J.S.'s] behalf, due to large sums of monies she has received in*
> *the past.*

> . . . .

> 'These parties have a troubled history (see Case No. 19DV00640).
> *I would like to keep this matter from blowing up if we can.*'
> (Emphases added.)

"66.    Subsequently, Booth and respondent arranged to have a phone call on May 19, 2020.

"67.    On May 20, 2020, respondent sent an email to Booth with an attached 'copy of the proposed Settlement and Release that I am working on getting [M.S.] to sign.' Respondent stated in the email:

> 'As I noted in my call yesterday, *it is my hope we can keep a reasonable lid on*
> *this matter and not have it blow up into further litigation and law suits* [sic].

16

'I believe having the parties' enter into the attached mutual settlement agreement would be a tremendous first step in that direction.

'I know you have reviewed the 19DV case where my client is the victim and yours the assailant. There is a lot more to that case than I believe either you or I have been able to wrap our head around at this point. There was also a prior incident with [*sic*] the parties' lived in MO when your client slit the forearm of my client from nearly elbow to wrist. There are medical records and police reports that would correspond and support.

'Unfortunately, I think there is even more to these two parties past than the above. My client is also starting to produce documentation, which I am working to organize in a presentable fashion, supporting his claims of monies and property your client has in essence unlawfully converted to her own. Now, there may [be] both facts and evidence that your client has to contest those assertions and allegations, *but that is precisely the point I am trying to get at. That is, that if we fail to keep a reasonable lid on this matter early, it is without question going to spill over into more litigation.*

'I am working on a separate letter today (05/20) also, one that I plan to forward to you by this evening. The letter will address some of the personal property and money matters.

'All of the above said, in the spirit of candor and professionalism, please know on the front end that [M.S.] has indicated he will not agree to a no-contest consent order is [*sic*] this matter. As that would not only affect his ability in the future to find housing and employment, but would also, in practice, take away his 2nd Amendment Rights. That is not something he can agree to. I believe [J.S.] could understand why that is the case. In the event a trial will ultimately be necessary, I will need time to issue business record subpoenas and get in contact with at least one or two additional witnesses. I also believe will we [*sic*] need at least a half-day for the trial. These are all points I intended to relay to the Court at the Status

17

Hearing on Friday, thus why I wanted to provide you some advance notice of same in the spirit of openness.' (Emphasis added.)

"68.     After not receiving a response, respondent sent Booth a follow-up email on May 22, 2020. In the email, respondent noted that he was still working with M.S. 'to get clear on the property and money issues, and am preparing a corresponding letter to your attention.' Respondent noted that the previous day, M.S. had told him that he had proof J.S. had written a fraudulent check from M.S.'s checking account. Respondent said, 'I have of course asked my client to forward what documentation he has in this regard, so I can forward it on to you. The check was apparently written somewhat recently based on what was initially stated to me.' Respondent concluded his email by stating:

> 'As I noted in my earlier messages, *I would very much like to avoid this thing blowing up like a powder keg*. I plan to ask for Pretrial to be set a few weeks out, to give you and I time to talk, and me time to look at what discovery, if any, I will truly need if this matter were to have to go to Trial. Just brief heads up there.' (Emphasis added.)

"69.     Booth responded back a few minutes later, stating:

> 'We are nowhere near an agreement at this time. Send me credible evidence of issues like the accusation that [J.S.] wrote a check on his account and I will respond.

> 'Since this action has nothing to do with personal property, it is our intention to not engage in discussions over personal property issues until appropriate protections are in place for [J.S.].'

"70.     In May 2020, M.S. was charged with violating the temporary orders (Johnson County Case No. 20-DV-00678). On May 26, 2020, M.S. was arrested pursuant to a warrant.

"71.     That same day, respondent sent an email to Booth. In the email, respondent wrote:

> '[M.S.] has asked about the possibility of a 4-way settlement
> conference to be attended by counsel and the parties.
>
> 'I know in past emails and during the Status Hearing held last week
> you have stated [J.S.] does not wish to discuss any property matters,
> and only wishes to focus on the protection claims. Notwithstanding,
> it was still my sincere hope the parties might be able to save
> themselves a lot of expense and time by trying to timely resolve all
> matters pending between them, in an amicable setting?
>
> 'I would appreciate it if this request could be relayed to [J.S.] as timely
> as possible. We could file a short agreed order allowing attendance and
> communication at this conference once coordinates [*sic*] In the
> alternative, *I have relayed to* [M.S.] *that should* [J.S.] *not wish to
> hold such discussions, the only option will be to file a corresponding
> civil action to deal with property and money matters.*' (Emphasis added.)

"72.     Booth responded that same day, indicating that he would forward the request to
J.S. Booth also asked respondent to provide information regarding the property and money M.S.
claimed J.S. had wrongly taken.

"73.     On June 10, 2020, respondent sent an email to Booth, trying to schedule a phone
call sometime in the next two days to discuss with him

> 'various pending issues between the parties that I would like to at least
> try and discuss with you, as I am presently preparing a *Petition for
> Partition* as well as a *Complaint for Damages* (both civil filings) that
> will be filed [*sic*] in Johnson County by weeks end. Thus, [J.S.] will
> have to confront these issues one way or another. As surprised as I
> was to hear it even today, [M.S.] would still like to avoid more legal

19

issues popping up for either party.'

"74.    Booth responded back that day, stating that he was available for a phone call that Friday. Booth also claimed that the civil actions respondent mentioned were 'not appropriate under the circumstances, as you know, I'm sure, the district courts handle these matters under the general divorce statutes.'

"75.    It appears that Booth and respondent were unable to speak that Friday.

"76.    On June 18, 2020, respondent emailed Booth, asking if he was available to speak that day or early the next day, prior to a status conference scheduled in the PFA case. Booth responded that he didn't have time to speak that day but maybe would have time to speak the next day.

"77.    That same day, respondent sent a follow-up email to Booth, stating:

'As we are not talking today, and I want to give you a chance to hold a conversation with your client about a specific topic, I will provide the "short" version here.

'In 2014, [J.S.] assaulted [M.S.] while intoxicated. Specifically, she slashed [M.S.] arm from elbow to wrist. It resulted in over $250,000.00 in medical work.

'At the time of the incident, your client called [A.K.], a mutual friend of the parties whom both went to high school with, and confessed to the crime. Your client was the one who actually called 911 because she was no [sic] nervous of what she had done.

'Police showed up later that night, as did [A.K.]. At the time my client lied to police and told them it was an "accident." Police wanted to

20

pursue charges, but [M.S.] refused to change his story due to threats from your client at the time of making his life difficult.

'My client has been in contact with the Cass County (MO) D.A.'s office, and as the incident would classify as a Class A felony—due to the extent of damages and medical bills—they can still pursue the charges. They are ready to do this.

'While not as serious, a similar incident occurred in 2019. It is the DV charge. My client literally dogged [*sic*] the subpoena, so they could not pursue charges. [M.S.] has a call with their office next week to review the file. It would still be within the 3-yr statute of limitations.

'There is also a serious tax fraud issue. I genuinely did not know before this matter that the IRS will literally provide financial rewards for those who turn in someone who has committed tax fraud, assuming charges are later substantiated. <u>Your client engaged in same with [J.S.R.]. Owner of [J.S.R.] Home Builders. He provided [J.S.] with well over $100k in money.</u> He also made a fake document indicating [J.S.] worked for [J.S.R.] Home's and made $6,000.00 a month income. This is how she applied for and was approved for an apartment at Watercrest at City Center. [J.S.R.] verified [J.S.] had a job, however [J.S.R.] never issued [J.S.] any paychecks. Rather, [J.S.R.] merely gave her money. The two were in a "romantic" relationship. Despite [J.S.R.] being married to [N.R.].

'*Joe, I am providing the details I am above, and mentioning specific names, so you can hopefully speak with [J.S.] and let her know that the last thing either of our clients want to do is go to war with the other.*

'There is also the serious conversion issue with the $25k. Authorities in MO have updated Police Reports recently so as to confirm that it was

21

law enforcement who specifically directed [M.S.] to take his name off the joint account at the time, as he had his identity stolen. Again, law enforcement can verify this.

'*While somewhat surprising to me,* [M.S.] *still would like to have all four (4) of us sit down and work all this out, as opposed to all of us litigating out the matters over the next 12 months.* If it would make you and [J.S.] more comfortable, we could even do a Video Conference where my client is with me in my office, and your [*sic*] with you.

'As for tomorrow, I plan to tell the Judge we still want to keep the trial date held as is. That will hopefully allow time for our settlement conference.

'[M.S.] *again does not want to see your client or himself get into a bad spot.* He even indicated that if this is about the $25k inheritance from my client's father, [M.S.] is willing to help [J.S.] some financially if she needs it. All details we could discuss during the settlement conference.'

"78.  Booth responded back by email that same day, June 18, stating:

'First, Do [*sic*] you have any evidence you are willing to share that would support these claims? Any at all?

'Second, are you saying that [M.S.] will pursue these various actions and claims unless [J.S.] does what? Sits down to talk, or are you asking her to drop the protection from abuse action in exchange.'

"79.  Respondent replied:

'I am doubling check [*sic*] with [M.S.] to determine what he has now, specifically. I may also need to formally subpoena a police department or

two for a full report, as well as maybe a hospital. I will have more
information by tomorrow morning to share one way or another.

'The request to sit down has not changed. Was always [M.S.'s] desire,
and still is, to have these two parties civilly resolve their issues as
opposed to using the court system. He has known [J.S.] for going on
some 25 yrs. as I understand it. I candidly am still trying to get caught up
on that history, and all that has occurred. All I know right now is that my
client believes if the parties' could talk civilly with one another, with the
assistance of counsel in a secure setting, we might be able to work
through a lot of issues.'

"80.    On June 19, 2020, respondent, on behalf of M.S., filed a separate action in
Johnson County District Court—Petition for Partition & Complaint for Damages—Case No. 20-
CV-2599. In the petition, M.S. alleged that J.S. had wrongfully retained $25,500 of M.S.'s money
and had taken various pieces of personal property from M.S. Subsequently, Booth, on behalf of
J.S., filed an answer and counterclaim.

"81.    On July 10, 2020, Booth, on behalf of J.S., filed a Trial Brief and Motions for
Sanctions, seeking sanctions against M.S. because of his multiple violations of the temporary
orders established in the case and sanctions against respondent, based on the emails he sent to
Booth (quoted above), suggesting that M.S. would pursue unrelated civil and criminal actions
against J.S. unless she agreed to settle the pending PFA petition.

"82.    On July 23, 2020, respondent filed a response to the motion for sanctions,
generally denying that the emails he sent to Booth were inappropriate.

"83.    A final hearing on the PFA petition was scheduled for July 24, 2020. At the
hearing, M.S. indicated that he would be willing to enter into a final consent order regarding the
PFA. The matter was then continued to August 14 for the parties to present the agreement and for
the court to hear arguments regarding J.S.'s motion for sanctions and attorney fees.

"84.    On August 14, 2020, the final consent order was filed in the case. The order notes that J.S. and M.S. 'have knowingly and voluntarily waived their rights to a hearing' and that M.S. 'consents to the orders without finding of fact or fault.' That same day, the court conducted a hearing regarding the motion for sanctions and took the matter under advisement.

"85.    A transcript of the August 14, 2020, hearing could not be produced because the audio equipment being used to record the hearing was not working.

"86.    On August 21, 2020, the district court issued a journal entry denying the motion for sanctions. The journal entry indicates that the district court denied the motion for sanctions against M.S. because criminal proceedings were pending against him for violating the court's temporary orders. Regarding the motion for sanctions against respondent, the journal entry simply stated that the motion was denied. The journal entry did not provide the court's reasoning for denying the motion.

"87.    On August 26, 2020, the ODA received Booth's complaint against respondent regarding the emails (noted above) that he sent to Booth.

"88.    The matter was docketed for investigation as DA13,563. Respondent submitted a response to Booth's complaint and cooperated in the subsequent investigation.

*"Count III-DA13,665*

"89.    In May 2016, [B.S.] filed for divorce from his wife, [T.], in Johnson County District Court, Case No. 16-CV-2992. Two children had resulted from the marriage, a 15-year old and an 11-year old.

"90.    Eventually, the parties entered into an agreement regarding a parenting plan and property division. A divorce decree was filed on September 1, 2017.

"91.     In March 2018, attorney Kelli Cooper, on behalf of [T.], filed a motion to modify the parties' parenting plan, alleging that [B.S.] had engaged in physical and emotional abuse of the ex-couple's children.

"92.     In February 2019, while the motion to modify was still pending, respondent entered his appearance on behalf of [B.S.].

"93.     Ultimately, a hearing on the motion to modify occurred June 17–19, 2019. Thereafter, on August 1, 2019, the court issued its journal entry, modifying the parenting plan.

"94.     On October 8, 2020, respondent, on behalf of [B.S.], filed a motion to modify the parenting plan. That same month, the court ordered the parties to participate in mediation.

"95.     Ultimately, a status conference was scheduled for March 3, 2021.

"96.     Prior to the status conference, respondent sent attorney Cooper an email on February 17, 2021. In the email, respondent noted that there were three attachments to the email: (1) a letter from respondent to Cooper; (2) a letter from [B.S.] to Cooper; and (3) a proposed Agreed Journal Entry to resolve [B.S.]'s pending motion to modify the parenting plan. Regarding the letter from [B.S.] to Cooper, respondent wrote:

'At the request and insistence of [B.S.], I have also enclosed the latter document which [B.S.] has prepared himself independently. As a review of the additional PFD enclosure reflects, the enclosure contains the opinions and contentions of [B.S.] in the matter.

. . . .

. . . .

'For whatever it may be worth, please know I have spoken with [B.S.] a few times recently as to the advantages of getting this matter

25

resolved without intensive court involvement, or anyone else for that
matter. Of course, [B.S.] has his own opinions and perceptions of
the matter. As do you and I. However, I think all could agree an early
global settlement would be the best way *to insulate the parties' son* from
a parenting conflict, or that which may follow:'

"97.    In the attached letter from respondent to Cooper, respondent noted the proposed
Agreed Journal Entry and asserted that it represented a reasonable settlement to the parties'
disagreement over child custody. Respondent asked that the agreement be accepted by February
25, 2021.

"98.    Respondent also noted in his letter the letter that [B.S.] provided to him to
forward to Cooper. In a section of his letter titled 'Additional Considerations—Not "Business as
Usual,"' Respondent stated:

> '[B.S.] has also asked that I relay another point in close. And that
> being the efforts he has made to ensure that if litigation does proceed
> forward, he does not intend to allow tactics utilized in the past to be
> utilized again.
>
> . . . .
>
> . . . .
>
> 'I could expound on the [*sic*] all the research [B.S.] had done, or his
> efforts in getting in contact with the State AG's office to formalize a
> lengthy criminal complaint with reference to his concerns with how the
> matter was handled previously, and with intent to dual-copy the relevant
> BAR agencies, but I am cognizant that you know [B.S.], and that
> you can likely appreciate that this is not something he takes lightly.

'[B.S.] has prepared his own attachment to this Letter, which he has asked I forward. The attachment tracks his concerns in more detail. You may review same if you wish, and will note the time period covered.

'All the above being said, I have advised [B.S.] that often one can attract more bees with honey. As opposed to something else. And for that reason, I am seeking to extend this sincere "olive branch" to resolve the matter timely and quickly for all parties and counsel's benefit. If this does not occur timely, however, I am inclined to speculate [B.S.] may indeed take a different approach to litigation moving forward, and those whom he may seek to involve starting the morning of Friday the 26th if we do not have an agreement. I would sincerely like to avoid having to even think about what that will entail. Rather just avoid it.'

"99.    In the letter from [B.S.] to Cooper, [B.S.] accused Cooper of committing numerous instances of unethical and criminal misconduct during her representation of [T.] and, consequently, threatened to file civil and criminal actions as well as file a disciplinary complaint against her.

"100.    After not receiving a response, respondent sent a follow-up email on February 26, 2021, stating: 'To keep things short, I would sincerely like to get this one settled. As I fear it will get messy and complicated—not to mention costly for parties—if we can't stop the train before going off the tracks.'

"101.    Cooper replied on March 1, stating that her client would agree to the terms of the proposed journal entry. But, Cooper asked that they appear for the March 3 status hearing to put their agreement on the record.

"102.    At the March 3 hearing, Cooper expressed objections about respondent's February 17 email and attachments. Ultimately, the district court did not approve the proposed journal entry, citing concerns about possible coercion/blackmail arising from the email and attachments.

"103.    The registry of actions for Case No. 16-CV-2992 indicates that no further action was taken regarding [B.S.]'s October 8, 2020, motion to modify the parenting plan.

"104.    On March 11, 2021, the ODA received a disciplinary complaint from Cooper, contending that respondent's email and attached letters constituted an improper threat to her, *i.e.*, that if [T.] did not accept [B.S.]'s proposed settlement agreement, [B.S.] would pursue civil and criminal actions against her as well as file a disciplinary complaint.

"105.    The matter was docketed for investigation as DA13,665. On April 9, 2021, the ODA received respondent's response to Cooper's complaint. In his response, respondent stated that it was not his intent to convey a threat to Cooper when he emailed [B.S.]'s letter to her. Respondent indicated that he was merely following [B.S.]'s directives in forwarding the letter to Cooper and that he did not share [B.S.]'s beliefs regarding Cooper's conduct in representing [T.].

"Conclusions of Law

"106.    The hearing panel makes the following conclusions of law based on clear and convincing evidence.

"107.    All Kansas lawyers are bound by Kansas Supreme Court Rule 203 to comply with the Kansas Rules of Professional Conduct (KRPC) found at Rule 240, Rules of the Kansas Supreme Court.

"108.    Misconduct—violation of the KRPC—is a ground for discipline by this Board. Kansas Supreme Court Rule 203(b).

"109.    The panel finds, on clear and convincing evidence, that respondent violated the following rules, in the cases filed against him, as follows:

28

*"Count I-Case No. DA13,349*

"110.    Judge Wonnell found that respondent committed sanctionable conduct in filing, without court permission, a motion alleging misconduct by the GAL, 'in direct violation of the current, standing applicable order.' Under Rule 220(b), this is prima facie evidence of a violation, imposing on respondent the burden to disprove the violation—which he failed to do.

"111.    Rule 3.4(c), KRPC provides:

'A lawyer shall not: . . . (c) knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists';

"112.    Respondent violated Rule 3.4(c).

*"Count II-Case No. DA13,563*

"113.    Respondent sent a threat to attorney Joseph Booth that, unless a suitable 'settlement' were reached in the Protection From Abuse action filed by Booth's client—i.e. dismissal—then respondent's client would pursue criminal charges and tax fraud complaints against Booth's client. Such criminal and tax fraud claims had nothing to do with the underlying PFA action.

"114.    While threatening criminal charges to gain an advantage in a civil matter is not prohibited, it is necessary 'that the criminal matter is related to the client's civil claim.['] ABA Formal Opinion 92-363 (July 6, 1992), available online at https://www.americanbar.org/products/ecd/chapter/219928/.

"115.    As noted above, Rule 4.4(a) provides that a lawyer 'shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person.'

29

"116.    Respondent violated Rule 4.4(a) by threatening Booth's client with criminal and tax fraud charges unless the PFA were settled.

"117.    Rule 8.4(a), KRPC provides:

>   'It is professional misconduct for a lawyer to: (a) Violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another';

"118.    Respondent violated Rule 8.4(a), by parroting his client's words and conveying his client's threats.

"119.    Rule 8.4(d), KRPC provides:

>   'It is professional misconduct for a lawyer [to]: . . .

>   '(d) engage in conduct that is prejudicial to the administration of justice';

"120.    Respondent violated Rule 8.4(d) by threatening Booth's client with criminal and tax fraud charges unless the PFA were settled. In closing argument, respondent admitted a violation of Rule 8.4(d) in this Count.

*"Count III-Case No. DA13,665*

"121.    In threatening attorney Cooper and her client, respondent conveyed his client's threatening letter, and supported with his own words, threatening criminal complaints against Cooper's clients and disciplinary complaints against Cooper, unless the divorce action were settled to the satisfaction of respondent's client.

"122.    As noted above, Rule 4.4(a) provides that a lawyer 'shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person.'

"123.   Respondent violated Rule 4.4(a) by threatening Cooper and her client with criminal charges and disciplinary complaints unless the divorce case were settled to the satisfaction of respondent's client.

"124.   As noted above, Rule 8.4(a), KRPC makes it misconduct to violate the rules or knowingly assist another to do so.

"125.   Respondent violated Rule 8.4(a) by threatening Cooper and her client with criminal charges and disciplinary complaints unless the divorce case were settled to the satisfaction of respondent's client, and conveying his client's letter making those threats.

"126.   As noted above, Rule 8.4(d) makes it professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

"127.   Respondent violated Rule 8.4(d) by threatening Cooper and her client with criminal charges and disciplinary complaints unless the divorce case were settled to the satisfaction of respondent's client.

"128.   Rule 8.4(g), KRPC provides:

> 'It is professional misconduct for a lawyer to: (g) engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.'

"129.   Because of the repeated nature of respondent's conduct in making threats to gain advantage for his clients, respondent violated Rule 8.4(g). See also, *In re Pyle*, 278 Kan. 230, 241[,] 91 P.2d 1222 (2004) (finding violations of Rules 4.4 and 8.4(d) where respondent 'wrote the letter merely to threaten [opposing counsel] with the sole purpose "of attempting to frighten or to put pressure on opposing counsel to settle the lawsuit upon the terms dictated and desired by [respondent]."'); and *In re Kenny*, 289 Kan. 851, 217 P.3d 36 (2009) (finding violations of Rules 4.4, 8.4(d) and 8.4(g) where lawyer conveyed client's threat to file disciplinary complaint against opposing counsel unless opposing party settled claims)[;] as his pattern of misconduct reflects adversely on his very fitness to practice.

31

"Recommended Discipline

"130.    In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"131.    Under Standard 6.2—Abuse of the Legal Process, Rule 6.22 states:

> 'Suspension is generally appropriate when a lawyer knows that he or she is violating a court order or rule, and causes injury or potential injury to a client or a party, or causes interference or potential interference with a legal proceeding.'

"132.    In the present case, respondent acted knowingly, and not negligently, in filing a motion in direct contravention of a court order expressly requiring him to submit the motion to the court before filing it. He knew he was violating the order because (a) he heard the court make the order; (b) he asked the court for clarification at the time the order was entered; and (c) he reviewed the draft and then saw the submitted and filed journal entry setting out the court's ruling. Injury was caused to other parties, who had to pay lawyers to oppose the motion, and to the legal system, which was burdened and delayed by the filing and prosecution of the motion.

"133.    Under Standard 7.0—Violations of Duties Owed As A Professional, Rule 7.2 provides:

> 'Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system.'

"134.    In the present case, respondent acted knowingly, and not negligently, when he

made several inappropriate threats, and filed a motion in direct contravention of a court order that the motion be submitted to the court before it was filed. This knowing conduct violated the duties owed by respondent as a professional as enumerated above. The conduct also caused injury to [the] parties, court and the legal system, by requiring the expenditure of lawyer and court time and resources, and delaying the proceedings.

"Aggravation and Mitigation

"135.   Pursuant to Rule 226(a)(1)(C), the panel considered and applied the following aggravating and mitigating circumstances. Aggravation or aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. Mitigation or mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. Mitigating factors will not excuse a violation and are to be considered only when determining the nature and extent of discipline to be administered.

"136.   The panel applied the following aggravating factors from Rule 226:

(c)     a pattern of misconduct—the three charges are quite similar, and there was evidence that respondent has engaged in similar conduct in at least one other case;

(d)     multiple offenses—respondent is found to have violated a number of rules, in more than one case; and

(g)     refusal to acknowledge wrongful nature of the conduct—respondent, while acknowledging most of the facts alleged, denied any violation of the KRPC and—while acknowledging some of his conduct to be 'stupid'—he did not admit that any of it was misconduct.

"136.[*sic*]     The panel applied the following mitigating factors from Rule 226:

33

(a)     absence of a prior disciplinary record—respondent has had no prior complaints;

(b)     absence of a dishonest or selfish motive—it appears that respondent's motive was always to advance the cause of his clients, albeit sometimes overly zealously;

(f)     inexperience in the practice of law—at the time of the first complaint, respondent had been practicing law for a total of seven years, and he had practiced domestic relations law for some period less than that;

(g)     previous good character and reputation in the community including any letters from clients, friends, and lawyers in support of the character and general reputation of the attorney—it appears from Google ratings, Super Lawyers—Rising Stars, Attorney and Practice Magazine, and Expertise.com Best Divorce Lawyers, that respondent enjoys some degree of recognition among members of the public and some other members of the Bar. The panel would wish for letters of support from other lawyers separate from the respondent's own sister, who happens to be a lawyer but might be expected to express words of support regardless of the situation. But the various online ratings are sufficient to demonstrate some degree of respondent's reputation in the community;

(k)     other sanctions—the panel does not conclude that the imposition of sanctions by the various courts as described were sufficient to mitigate the discipline here recommended; and

(l)     remorse—the respondent repeatedly stated his regret for the conduct, and that, given the opportunity, he would not repeat it.

"Discipline

"137.    Based on the Findings of Fact and Conclusions of Law set forth above, and applying the Standards described above, the panel concludes and recommends that respondent be suspended for a period of six months.

"Probation Plan

"138.    On October 4, 2022, respondent timely presented a proposed probation plan in case the hearing panel found one or more violations of the rules by clear and convincing evidence. Respondent complied with Rule 227(a) by timely submitting a plan and with Rule 227(c) by complying with the terms of the probation plan at least fourteen days prior to the hearing.

"139.    In his probation plan, respondent proposes, during the following twelve months:

    a.    Monthly one-hour coaching sessions with Professor Michael Hoeflich of the University of Kansas School of Law, with Professor Hoeflich reporting to the ODA quarterly;

    b.    Using the services of the Kansas Lawyers Assistance Program (KALAP) by:

        (1)    Implementing improvements suggested by KALAP;

        (2)    Meeting with KALAP mentor, Jace McClasky, an experienced family law practitioner at least once per month;

        (3)    Attending KALAP therapy sessions; and

        (4)    Attending KALAP resiliency group meetings periodically.

35

c.    Respondent cites two ethics CLE courses he has attended in the past fourteen months, and states that he will attend one-hour of additional ethics CLE per month, including five hours on civility and professionalism, over and above the hours required by Kansas Supreme Court Rule 804.

d.    Respondent will write and provide to the ODA memorandum on the key learning points from his coaching sessions and CLE.

e.    Respondent will engage in collaboration with other members of his law firm.

"140.    The panel finds that this proposed plan, while apparently workable, very substantial, and very detailed, it does not provide adequate safeguards to address the violations listed above, to protect the public while the plan can and should correct the violations found above, and is in the best interest of the bar and the public, the plan's proposed duration is too short. Therefore, the probation plan proposed by the respondent is rejected. However, the panel does believe that with one addition—requiring the plan to be in place for two years instead of one—the proposed plan would provide adequate safeguards to address the violations listed above, to protect the public, and to comply with the KRPC, that it can and should correct the violations found above, and is in the best interest of the bar and the public. So, with the additional condition that the probation plan remain in place for two years from the date of this order (rather than the one year proposed by the respondent), all of the other terms of the respondent's proposed probation plan are accepted and put into place, starting on the date of this Order.

"*Recommendation of the Hearing Panel*

"Therefore, based upon the foregoing Findings of Fact and Conclusions of Law, the panel recommends that the respondent be suspended for a period of three months, but that this discipline be suspended and that respondent be placed on the probation plan he submitted with

36

the additional condition that it remain in place and be complied with for a period of two years from the date of this final hearing report.

"Costs are assessed against the respondent in an amount to be certified by the ODA.

"Concurring and Dissenting Opinion

"I concur in the other panel members' decisions on Case Nos. DA13,349 and DA13,665, but dissent on Case No. DA13,563, which I would vote to dismiss. I also dissent from the other panel members' decision as to discipline, and I vote for public censure.

"141.   The ODA and majority opinion cites Kansas Supreme Court Rule 220 reciting that a prior judicial decision based upon the same conduct as prima facie evidence of misconduct. With regard to Case No. DA13,563 the District Court DENIED the complainant's motion for sanctions. The trial court's decision is based upon the standard of proof of a preponderance of the evidence. In this proceeding, the applicable standard of proof is 'clear and convincing'. Further, Rule 220 provides that the party opposing the prior decision has the burden of proof to overcome the prima facie evidence of the prior adjudication. In this case, the ODA did not provide clear and convincing evidence to overcome the presumption created by the operation of Rule 220.

"142.   As to discipline, I dissent for the reason that these cases present the first opportunity for discipline to affect the conduct of respondent. It is clearly proven and true that Judge Wonell's [*sic*] civil adjudication in 2019, based upon the same conduct which first occurred in 2017, was a judicial determination on the issue of *civil* liability, not *professional* responsibility. Thus, no prior discipline has been imposed. Secondly, the second motion for sanctions resulted in dismissal of the sanctions motion said adjudication upon similar conduct as the present complaint in Case No. DA13,563 occurred in 2020 and the trial court decision entered in August of 2020. Therefore, at that time, there was no prior imposed discipline. Finally, in Case No. DA13,663 the conduct of respondent in March of 2021 is clearly misconduct as pronounced in the majority decision. However, there was no prior discipline imposed according to our system. There was no evidence given at hearing of prior reprimand nor cautionary letter to respondent from the ODA.

37

Therefore, in my opinion, the imposition of 'suspension' is not fair to a practicing attorney with no prior disciplinary history. Both cases in which I concur are first offenses.

"143.    While each case is serious giving rise to the need for discipline, since the filing of the last action in March of 2021, there are no further instances of bad conduct of respondent brought to our attention. Perhaps retaining good counsel, receiving the mentoring that has thus far occurred is sufficient to correct the misconduct and further dissuade others from considering use of the woeful tactics as shown in these cases. I was clearly convinced that resoibdebt [*sic*] had truthfully and professionally assisted in the investigation of all three of the complaints, assisted the assigned investigator and testified truthfully during the hearing of these cases. Since the ODA chose not to hear from the 'boots on the ground' investigator, this panel heard from the investigator only through the presentation of evidence by respondent. This testimony of Mr. Rowe, the assigned investigator, carries great weight with me. No one testified nor was heard to say that diversion would not have been a fair and reasonable resolution to the complaints, including the judges and attorney's who labored, endured and judged the prior bad acts of respondent. The testimony of Mr. Rowe, shedding light on the assistance of respondent, providing the background and obtaining the opinions of those involved, must not and cannot be ignored. If these seasoned lawyers and judges were satisfied with diversion, then perhaps the least sanction likely to do the most good, should now be administered.

"144.    It is for these reasons that I concur in the findings of misconduct in Case Nos. DA13,349 and DA13,665 even though the conduct at issue in Case No. DA13,349 occurred in 2017 and July of 2018. The sequence of events sheds light to this analysis. The first abusive threat was in 2017. The formal complaint was not filed until September of 2022. As to discipline, there was no explanation of the delay in bringing these cases to hearing and this fact alone weighs heavily in my reasoning that 'suspension' is simply too harsh. It is my hope that if respondent had been timely punished for the 2017 and 2018 conduct, we could have avoided the remainder. Censure is more in line with violations of the MRPC for first time serious breaches of these pillars of professionalism.

"145.    I dissent from imposing discipline under Rule 8.4(g) as such imposition of discipline is not supported by the evidence. As stated above, there has been no prior discipline

upon which to opine respondent's conduct reflects a head strong disposition to engage in
unprofessional conduct and therefore, unfit to practice law. The course of these three cases and
public censure is a serious sanction and it adequately protects the public and provides
considerable guidance for the benefit of all. Public censure is warranted."

DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the panel's findings,
and the parties' arguments and determines whether KRPC violations exist and, if they do,
what discipline should be imposed. Attorney misconduct must be established by clear and
convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme
Court Rule 226(a)(1)(A) (2023 Kan. S. Ct. R. 281). "'Clear and convincing evidence is
"evidence that causes the factfinder to believe that 'the truth of the facts asserted is highly
probable.'"'" *In re Murphy*, 312 Kan. 203, 218, 473 P.3d 886 (2020).

The respondent was given adequate notice of the formal complaint, to which he
filed an answer. The respondent initially filed exceptions to the final hearing report but
later withdrew them. Therefore, the panel's factual findings are considered admitted.
Supreme Court Rule 228(g)(1), (2) (2023 Kan. S. Ct. R. 288). The evidence before the
hearing panel clearly established the charged misconduct violated KRPC 3.4(c) (2023
Kan. S. Ct. R. 394) (knowingly disobey an obligation under the rules of a tribunal except
for an open refusal based on an assertion that no valid obligation exists), KRPC 4.4(a)
(2023 Kan. S. Ct. R. 405) (shall not use means that have no substantial purpose other than
to embarrass, delay, or burden a third person), KRPC 8.4(a) (2023 Kan. S. Ct. R. 433)
(violate or attempt to violate the rules of professional conduct, knowingly assist or induce
another to do so, or to do so through the acts of another), KRPC 8.4(d) (engage in
conduct that is prejudicial to the administration of justice), and KRPC 8.4(g) (engage in
any other conduct that adversely reflects on the lawyer's fitness to practice law).

The only remaining issue is to determine the appropriate discipline for the respondent's violations. Although the hearing panel first proposed a six-month suspension, its final recommendation was to suspend respondent for three months, but that this discipline be suspended and that the respondent be placed on the probation plan he submitted with the added condition that it remain in place for two years from the date of the final hearing report. One member of the hearing panel concurred in the panel's decisions on case nos. DA13,349 and DA13,665 but dissented with respect to case no. DA13,563. This member also dissented from the other panel members' decision as to discipline. The Disciplinary Administrator's office agrees with the panel's recommendation.

After carefully considering the evidence presented, as well as the ABA Standards for Imposing Lawyer Sanctions, we adopt the panel's findings and conclusion, except for the recommendation that the probation plan be retroactively effective from the date of the final hearing report. We conclude it is in the best interest of the bar and the public to make the respondent's probation plan effective from the date this opinion is filed. Respondent is therefore suspended for three months, with the three-month suspension stayed pending successful completion of a two-year probation period, the terms of which are in the respondent's proposed probation plan, effective from the date this opinion is filed.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Christopher C. Barnds is suspended for a period of three months from the practice of law in the state of Kansas, effective from the date this opinion is filed, with the three-month suspension stayed pending successful

completion of a two-year probation period, in accordance with Supreme Court Rule 225(a)(3) (2023 Kan. S. Ct. R. 281) for violating KRPC 3.4(c), 4.4(a), 8.4(a), 8.4(d), and 8.4(g).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.

A true copy ATTEST

*Douglas T. Shime*

Clerk Supreme Court